STATE ex rel. ELLERBECK v. SALT LAKE CITY et al.

No. 1671 (81 Pac. 273).

MUNICIPAL CORPORATIONS—WATER PRIVILEGES—EXCHANGE—CONTRACTS —CONSTRUCTION—CONDITION SUBSEQUENT.—Where a contract between a city and certain farmers entitled to water for irrigation, for an exchange of water, provided that, in case the city made default in furnishing the farmers the exchange water from its canal, they reserved the right to use the water they agreed to exchange only during the time the city's default continued, unless the failure of the city continued for a period of six months, when it should be optional with the farmers to terminate the contract, and the city's ability to perpetually furnish the farmers the required amount of water in exchange was conceded, such contract provision was a condition subsequent, and did not prevent the city from acquiring an absolute right to the farmers' water, within Constitution, article 14, section 4, authorizing a city to incur indebtedness for waterworks owned and controlled by the municipality, and article 11, section 6, authorizing a city to exchange water rights for rights which shall be acquired and owned by the city, and be preserved to supply its inhabitants.

(Decided June 24, 1905.)

PROHIBITION by the State, on relation of George E. Ellerbeck, against Salt Lake City and others.

WRIT DENIED.

Stephens & Smith for relator.

F. S. Richards and C. C. Dey for defendants.

PER CURIAM.

This is an application to obtain from this court a writ of prohibition restraining Salt Lake City and its mayor, recorder, and treasurer from issuing, negotiating, or selling the municipal bonds hereinafter referred to.

The material facts, as presented by the petition of the relator and the answer of defendants, are as follows: On the 21st day of November, 1904, the city council of Salt Lake City duly passed an ordinance which was approved by the mayor of the city, which ordinance provided for and ordered a special election for the purpose of submitting to the qualified electors of said city the question of incurring a bonded indebtedness to the amount of $1,000,000 for the purpose of making necessary extensions in its sewer system, and of procuring a permanent and adequate increase in the water supply of the city. The present supply during the minimum flow, which is approximately 10,000,000 gallons per day, is estimated to be about one half enough to properly supply the present population of the city. Notice of such special election was given, to be held upon the 3d day of January, 1905; and thereafter the returns of said special election were duly canvassed by the city council of said city, and it was declared by the said city council that sufficient votes had been cast by qualified electors to authorize the issuance of the bonds. Previous to said election, for the purpose of presenting to the qualified voters of Salt Lake City the object and purpose of the issuance of said bonds, and a plan to be pursued for the acquisition of an additional water supply and an extension of the sewer system, an address, under the authority of the mayor and city council of Salt Lake City, was issued to the taxpayers of Salt Lake City, a copy of which is attached to and made a part of the petition herein, and in which address

it is pointed out and shown that the present water supply of the city is derived from four separate sources. These sources, and the quantity of water that each supplies daily during the minimum flow, are as follows: City creek, 4,802,134 gallons; Emigration creek, 1,000,000 gallons; Parley's creek, 4,202,740 gallons; Utah Lake reservoir, 43,560,000 gallons. Of this total daily quantity, only the creek (canon) water (10,004,874 gallons) is suitable for drinking and culinary purposes. The remainder (43,560,000 gallons), which comes from Utah Lake reservoir, is impure, and not fit for drinking or household purposes, and can only be used for irrigation and kindred uses. The only sources from which the city can obtain an additional supply of pure water for drinking and household purposes are Mill creek, Big Cottonwood, and Little Cottonwood, three mountain streams which flow into the valley from near-by mountains on the east. The daily supply of these creeks during the low-water season is as follows: Mill creek, 6,631,211 gallons; Big Cottonwood, 17,883,588 gallons; Little Cottonwood, 7,827,867 gallons. The water of these streams has already been appropriated, and is used by a large number of individuals to irrigate a considerable area of high-priced land that lies adjacent to the city. Two-thirds of the land upon which this water is now being used lies below the city's canal, through which its Utah Lake reservoir water is conducted, and there are no physical difficulties in the way of irrigating the lands with water from the canal. The owners of this land are willing to exchange their present supply of water from the mountains for water from the canal referred to, and the city has taken options from the farmers for the exchange in this manner of one-half the water of Big Cottonwood creek. Negotiations are pending by which it is expected that practically all of the waters of Big Cottonwood, Mill creek, and Little Cottonwood creek will be acquired by exchange or lease as soon as the necessities of the city shall require. The terms of exchange are as follows: The city is to pay a bonus of $10 per acre to the farmers, and give them during the irrigation season an additional quantity of twenty-five per cent.

more canal water than it receives of mountain water. It is proposed in the options to "grant, bargain, and sell" to the city all the farmers' rights to the perpetual use of the mountain water; but, in case default is made by the city in furnishing them the exchange water from the canal, in that event they reserve the right to use the mountain water, but only during the time the default continues, unless the failure of the city to furnish the exchange water continues for a period of six months, and then it is optional with the farmers whether the city's right to the use of the water under the sale shall be terminated or not. The ability of the city to perpetually furnish the farmers the required amount of Utah Lake water in exchange for the mountain water is conceded. The money which will be obtained from the sale of the bonds in question with the exception of about $70,000 to be used in repairing the city's canal from the Utah Lake reservoir, and in payment of the bonus to the farmers as a consideration for the exchange of water, is to be used by the city in the construction of the necessary conduits for conveying and turning into the city's present waterworks system the water received in exchange from the farmers, and for extending the city's sewer system.

The most serious objection urged by relator to the proposed issue and sale of the bonds in question is that the water rights which will be finally obtained by the city under the option contracts, when completed and effected by sale and exchange, are not absolute rights, but that such sale and exchange are subject to forfeiture in the event of certain contingencies, and that the interest which the city will finally acquire from sale and exchange of the waters by virtue of the option contracts is not such an ownership and control as is contemplated by section 4, article 14, of the Constitution of the State of Utah, which, so far as material here, provides as follows:

> "That any city or town, when authorized as provided in section three of this article, may be allowed to incur a larger indebtness, not exceeding

four per centum additional for supplying such city or town with water, artificial lights or sewers, when the works for supplying such water, light and sewers, shall be owned and controlled by the municipality."

In determining the question presented by relator's petition, we must construe the foregoing provision of the State Constitution in connection with section 6, article 11, of the same instrument, which is as follows:

"No municipal corporation shall directly, or indirectly, lease, sell, alien or dispose of any waterworks, water rights, or sources of water supply now, or hereafter to be owned or controlled by it; but all such water works, water rights and sources of water supply now owned or hereafter to be acquired by any municipal corporation, shall be preserved, maintained and operated by it for supplying its inhabitants with water at reasonable charges. provided, that nothing herein contained shall be construed to prevent any such municipal corporation from exchanging water rights, or sources of water supply, for other water rights or sources of water supply of equal value, and to be devoted in like manner to the public supply of its inhabitants."

It is conceded that the mountain water which the city will receive by the exchange is much more valuable for municipal purposes than the Utah Lake reservoir water, and that the superior quality of the mountain water for culinary purposes will fully compensate the city for the excess in amount which it will be obligated to furnish the farmers from Utah Lake. The power and authority of the city to thus contract for and exchange its Utah Lake water, which is an inferior quality and wholly unfit for household purposes, for a superior quality of mountain water, is expressly conferred by section 6 of the Constitution, unless it can be said that the transfer and exchange of water as contemplated would fail

to vest the city with ownership and control of the water received by it in exchange, as is contemplated by section 4, article 2, of the Constitution. The compliance or non-compliance with the conditions of the sale and transfer of the water in question will be exclusively within the control of the city, and so long as the city does that which it will be its legal duty to do, and which the farmers, in case of default, could by judicial proceedings compel it to do if there were no forfeiture clause in the contract of exchange, there can be no forfeiture of the water thus acquired by the city, and its title to the same will be as clear and indefeasible as though the exchange were absolute and unconditional.

We are of the opinion that, when sales and exchanges of the rights of the respective parties are made in and to the use of the waters, the forfeiture clause, being but a condition subsequent, is not obnoxious to the vesting of title and ownership in the city to the mountain water which it has received in exchange for lake water; and it is settled by the great weight of authority that when real estate is sold upon a condition subsequent, as the farmers propose to do in this case, the fee is transferred to and remains in the grantee until a breach of the condition and a re-entry by the grantor; that is, such a sale carries with it all the attributes and incidents of absolute ownership until the condition is broken. (*Towle v. Remsen,* 70 N. Y. 303; *Vail v. Long Island R. Co.,* 106 N. Y. 283, 12 N. E. 607, 60 Am. Rep. 449; *Bouvier v. Baltimore & N. Y. R. Co.,* 60 L. R. A. 750, and cases cited in note; 13 Cyc. 690; 1 Jones, Real Prop. in Conv., sec. 620.) In *Shattuck v. Hastings,* 99 Mass. 23, the rule is tersely, and, as we think, correctly, stated as follows:

> "A deed of land upon conditions subsequent conveys the fee with all its qualities of transmission. The condition has no effect to limit the title until it becomes operative to defeat it. Subject to this contingency, the estate will pass by deed or mortgage in the same manner and to the same extent as if no such incident were attached to it."

Applying the forgoing principles of law to the admitted facts in this case, we have no hesitancy in saying that the right and title of the city to the water it will receive from the farmers by the exchange, when made as contemplated, will constitute ownership, and will come clearly within the foregoing provisions of the State Constitution.

There are other objections made to the issue and sale of the bonds by the relator, but as the questions raised by such objections are without merit, and in no way affect the validity of the bonds, we deem it unnecessary to discuss them.

As heretofore stated in an oral opinion in which our conclusions were announced in this case, we are of the opinion that the provisions of the Constitution and the statutes authorizing the issue of this character of bonds have been substantially complied with, and that the bonds in question are valid. The petition of relator will therefore be denied.

It is so ordered.